IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DAFON CANTY,                          *

    Plaintiff,                    *

v.                                    *          Civil Action No. GLR-18-1404

DAYENA M. CORCORAN, et al.            *

    Defendants.                   *
                                 ***

**<u>MEMORANDUM OPINION</u>**

THIS MATTER is before the Court on Defendants Dayena M. Corcoran, Jeff Nines, William Bohrer, Vaughn Whiteman, Derek Baer, William Thomas, Mary S. Johnson, Christopher McKenzie, Gregory Forney, and Rodney Adkins, Jeremy Payne, Justin Yutzy, and Michael Vanmeter's (collectively, "Defendants") Renewed Motion to Dismiss, or in the Alternative, for Summary Judgment (ECF Nos. 23, 47). The Motion is ripe for disposition, and no hearing is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will grant in part and deny in part Defendants' Motion, construed as one for summary judgment.

## I.    BACKGROUND

### A.    <u>Plaintiff's Allegations</u>

Plaintiff Dafon Canty is a state prison inmate presently housed at North Branch Correctional Institution ("NBCI") in Cumberland, Maryland. (Compl. ¶ 3, ECF No. 1). He alleges that NBCI violated the American Correctional Association Standards ("ACA") as to maximum security inmates by housing him in cells that are too small and by housing

Maximum Security II inmates in the same cell. (Id. ¶¶ 15–17). Canty also alleges that Defendants failed to adequately address his safety concerns, retaliated against him for filing internal complaints, falsely accused him of threatening correctional officers, and damaged his personal property during a cell search. In support of his claim, Canty alleges the following facts.

### 1.    Assignment to Administrative Segregation to Avoid Herbert Sidbury

On December 16, 2016, Canty was assigned to administrative segregation because Herbert Sidbury, an inmate on Canty's "enemy list," was housed in general population in the Maximum Security Level II tier inside Housing Unit ("HU") 2. (Compl. ¶ 19). Canty was required to stay in administrative segregation until Canty transferred to another institution or agreed to remove Sidbury from his enemy list, or until Sidbury was reassigned to disciplinary segregation. (Id. ¶ 20). In October 2017, Sidbury was placed on disciplinary segregation. (Id. ¶ 21).

### 2.    Conflict with Darryl Powell

On November 26, 2017, Canty, who was still in administrative segregation, had an argument with Darryl Powell, another inmate in administrative segregation. (Id. ¶ 22). This was not their first confrontation; Canty and Powell were involved in a physical altercation in 2014. (Id. ¶ 23; Compl. Ex. C ["Apr. 27, 2014 Incident Recs."] at 1, ECF No. 1-1).[1] Powell threatened Canty after their argument, and Canty reported the argument to Defendants Susan Johnson, Correctional Case Management Specialist II ("CCMS II"), and

---

[1] Citations refer to the pagination assigned by the Court's Case Management and Electronic Case Files ("CM/ECF") system.

Sgt. William Thomas on November 28, 2017. (Id. ¶ 23; Apr. 27, 2014 Incident Recs. at 2).[2] Johnson responded to Canty's report, stating that Canty had been placed on administrative segregation pending an investigation into the matter. On November 29, 2017, Canty was served with a Notice of Assignment to Administrative Segregation. (Id. ¶ 25; Apr. 27, 2014 Incident Recs. at 3).

On December 5, 2017, Canty met with Johnson, Thomas, and Case Manager McMahon. (Compl. ¶ 26). Canty explained that he had an argument with Powell and expressed concern regarding his safety should he encounter Powell on the Maximum Security II tier. (Id.). Thomas told Canty, "You just need to be a man[.] [P]lus we need more information to place [Powell] back on your enemy list because if we decide not to [and] y'all fight again we [are] covered because you all signed off on the enemy [waivers] in 2014." (Id. ¶ 26). Canty explained that he consented to removing Powell from his enemy list because he was told that he would never encounter Powell again. (Id.). Johnson informed Canty that his conflict with Powell would be investigated. (Id.).

### 3.    December 2017 Security Classification Review

The following week, Canty attended his security classification review with Johnson, who recommended that Canty be reclassified as a Maximum I prisoner with a "possible transfer in the near future due to 'enemies.'" (Id. ¶ 27). Case Manager Bethany Comachia and Case Manager Supervisor Richard Roderick agreed with Johnson's recommendation. (Id. ¶¶ 28–29). However, Defendant Jeff Nines, the Assistant Warden, disagreed and

---

[2] In his Complaint, Canty asserts that he reported the altercation on November 27, 2017; however; Canty's handwritten report is dated November 28, 2017.

suggested that Canty be placed in general population for six months before considering Johnson's recommendations. (Id. ¶ 30).

On December 22, 2017, McMahon informed Canty that because Powell and Sidbury were both on disciplinary segregation, Canty would be taken off administrative segregation after the holiday and returned to HU 2, D tier. (Id. ¶ 31a).[3] At his segregation review meeting on December 27, 2017, Thomas and Johnson told Canty the same. (Id. ¶ 31b). However, Canty remained on administrative segregation for several days. (Id. ¶ 32).

On January 3, 2018, Canty had another segregation review meeting with Thomas, Johnson, and McMahon, who informed Canty that he should have been removed from administrative segregation. (Id. ¶ 33). Thomas promised to look into Canty's reassignment. (Id.). Later that day, Canty was reassigned to HU 2, D tier, cell 44 with inmate Courtney Bryant. (Id. ¶ 34).

### 4. Proximity to Powell

A few days after being transferred to HU 2, D tier, Canty saw Powell walking on the tier. (Id. ¶ 35). Canty learned that Powell had been removed from disciplinary segregation and was housed only ten cells away from him. (Id.). The next day, Canty asked an unidentified officer to tell Defendant Sgt. Gregory Forney that "he was facing trouble because Powell was on the tier." (Id. ¶ 36). Forney instructed Canty, through the same officer, to write a request-slip because Forney was not going to Canty's tier that day. (Id.

---

[3] Canty numbers two paragraphs in his Complaint as "31." The Court refers to the first paragraph, which appears at the bottom of page seven, as "31a" and to the second paragraph, appearing at the top of page eight, as "31b."

¶ 37). Canty wrote to Forney that same day and explained the situation with Powell, but did not receive a response. (Id. ¶ 38).

### 5. Complaints Regarding Powell, Bryant, and Security Threat Group Members

Canty met with Forney several days later and told him that Powell, an enemy, was housed on the same tier, and that he was afraid something would happen if Powell saw him. (Id. ¶ 40). Canty also informed Forney that although he was not a security threat group ("STG") member, he was housed with Bryant, who was a member. (Id.). Canty also complained that there was tension between he and Bryant because Canty regularly complained about his proximity to Powell. (Id.). Forney told Canty, "I put you in [there] with Bryant [and] I really don't think [Powell] [will] do [anything] to you." (Id.). Regarding Powell, Forney said he would look into the matter but would not promise to help, because neither he nor the other officers liked Canty or cared to help him. (Id.). Forney informed Canty that Forney was being transferred to Western Correctional Institution ("WCI") and told Canty to speak to whoever replaced him. (Id.).

In early January 2018, Canty submitted an Administrative Remedy Procedure ("ARP") reporting his conflict with Powell and his housing with Bryant; however, the report was not processed. (Id. ¶ 41). On January 22, 2018, Canty submitted another grievance directly to the Inmate Grievance Office ("IGO") about the threat Powell posed, but the grievance was dismissed because Canty failed to substantiate his claim that his safety and well-being were in jeopardy. (Id. ¶ 41; Compl. Ex. F ["Mar. 5, 2018 IGO Letter"], ECF No. 1-2).

On January 26, 2018, Canty submitted an ARP regarding his escalating tension with Bryant. (Compl. ¶ 44). In response, Defendant Officers Rodney Adkins and Christopher McKenzie allegedly revised the recreation schedule, pairing Canty with the STG group to which Sidbury belonged. (Id.).[4] Canty's ARP was never processed. (Id. ¶ 45).

On February 3, 2018, Canty submitted an ARP directly to the Commissioner's Office in which he asked to be moved out of the cell with Bryant and for modification of his recreational schedule. (Id.; Compl. Ex. I ["Feb. 3, 2018 ARP"] at 1–3, ECF No. 1-4). Canty also told Adkins he was not safe. (Compl. ¶ 45).

The Commissioner sent the ARP to NBCI for a response. (Id.). The ARP was dismissed with a notation that Canty could not seek relief through the ARP process for case management recommendations. (Id. ¶ 45; Feb. 3, 2018 ARP at 1). Canty appealed, and the Commissioner returned the ARP to NBCI's ARP Coordinator to review the rationale for the dismissal because the Commissioner did not agree with it. (Id. ¶ 48; Feb. 3, 2018 ARP at 4).

On February 28, 2018, Canty drafted a letter to Defendant Sgt. Derek Baer, expressing concern for his safety because he was housed with Bryant and assigned to recreation with STG members. (Id. ¶ 51; Compl. Ex. L ["Feb. 28, 2018 Letter to Baer"], ECF No. 1-6). He also explained that he was having issues with McKenzie and Adkins, who refused to move him from his cell and told him to fight back against Bryant. (Id.). He

_____

[4] Adkins asserts that he was not working on January 26, 2018 and was unaware that Canty filed an ARP that day, noting that Canty alleges that he sent the ARP directly to headquarters. (Adkins Decl. ¶ 5, ECF No. 23-10). Adkins further asserts that Canty would have sent his ARP through regular mail. (Id.).

gave the letter to Officer David Reed, who was assigned to the housing unit that day, to deliver to Baer. (Id. ¶ 52). Reed later informed Canty that Baer read the letter and would follow up, but Canty never received a response from Baer. (Id. ¶¶ 53–54).[5]

On March 1, 2018, Canty wrote informal complaints to Defendant William Bohrer, Chief of NBCI Security, and Nines concerning his cell assignment and recreation with STG members. (Id. ¶ 55; Compl. Ex. M ["Mar. 1, 2018 Inmate Compl."] at 1, ECF No. 1-7). Bohrer and Nines each instructed Defendant Lt. Vaughn Whiteman to respond. (Id. ¶ 56). Whiteman declined to take any action and directed Canty to the Inmate Handbook, which states that inmates can request a "convenience move" every six months. (Id.; Mar. 1, 2018 Inmate Compl. at 1–2).[6]

On March 4, 2018, Canty asked Baer whether he read his February 28, 2018 letter. (Id. ¶ 57). Baer responded by instructing Canty to ask his tier officers about moving. (Id.). Canty told Baer that Adkins and McKenzie refused to move him, but Baer "shrug[ged] his shoulder in a careless motion to nonverbally say o[h] well." (Id.). The following day, Canty wrote an informal complaint to Nines but did not receive a response. (Id. ¶ 58).

---

[5] Baer denies ever receiving either an informal complaint or an ARP from Canty. (Baer Decl. ¶ 5, ECF No. 23-11).

[6] Canty's account is confirmed by Nines, who reviewed Canty's base file and found two informal complaints, dated March 1, 2018 and March 5, 2018, that Canty submitted to Warden Frank Bishop; the Warden's office received them on March 5, 2018. (Nines Decl. ¶ 2, ECF No. 23-4). The complaints were forwarded to Whiteman for response, who responded to both complaints on one routing slip on March 8, 2018. (Id.). Whiteman advised Canty that he could request a convenience move every six months, but such moves were contingent on the Housing Unit Manager's approval. (Whiteman Decl. ¶ 5, ECF No. 23-12).

On March 6, 2018, Canty asked Adkins about moving to another cell and reiterated that he was scared and thought that Bryant was "up to something." (Id. ¶ 59). Adkins told Canty that he was not moving him and instructed Baer, "[T]ell Canty he is not [f-ing] moving out that cell." (Id.). Baer then told Canty that he was not moving and directed him to stop asking and stop writing grievances against staff, or Baer would place him on disciplinary segregation. (Id.). Baer directed Canty to go back into his cell with Bryant. (Id.).

### 6.     First Physical Altercation with Bryant

On March 12, 2018, Bryant instigated a fight with Canty. (Id. ¶ 60). After the fight, Canty told Adkins what happened and again asked to be moved to another cell. (Id.). Adkins told Canty that he was not moving, so Canty needed to "fight back and then work it out" and to "stop crying like a bitch and do what you need to kill [him] if you have to." (Id.). Canty said he wanted to refuse housing, but Adkins responded that he would not do the paperwork. (Id.).

A few hours later, Adkins called Canty to the HU 2 multipurpose room. (Id. ¶ 61). While there, Canty was approached by Adkins and Baer, who told Canty that: (1) they did not care about his problems; (2) he should stop filing grievances; (3) he was not moving; and (4) he needed to fight back. (Id.). When Canty said he was refusing housing, Baer threatened to "drag [him] back into Cell 2-D-44." (Id.). Out of fear, Canty walked back to his cell. (Id.). As he did so, Canty mumbled that he was going to write up the officers, and Baer warned him that write-ups go both ways. (Id.). When Canty asked how, Baer told him

that "we [will] come up with something." (Id.). When he returned to his cell, Canty wrote

an ARP and sent it to the Commissioner. (Id. ¶ 62).

### 7.    Confrontation by Defendants

On March 13, 2018, Baer, Whiteman, McKenzie, and Adkins called Canty out of

his cell. (Id. ¶ 63). Whiteman told Canty that they were not going to move him and that if

he did move, it would be to disciplinary segregation, where he would be held indefinitely.

(Id.). The other officers surrounded him and made "little remarks." (Id.). Canty again

explained that he feared for his safety around Bryant and the STG members who shared

his recreation schedule. (Id.). Canty also complained that it was not fair to put him on

disciplinary segregation when there were empty cells and two other inmates willing to

allow Canty to move in with them. (Id.). Whiteman instructed Canty to lie and say that

Bryant had a weapon so they could "lock him up," but Canty refused. (Id.). Whiteman told

Canty that his ARP was going to be dismissed and directed Canty to go back to his cell

with Bryant. (Id.). Canty then wrote another ARP directly to the Commissioner. (Id. ¶ 64;

Compl. Ex. O ["Mar. 13, 2018 Letter"], ECF No. 1-8).

On March 31, 2018, McKenzie and Adkins wrote a notice of inmate rule violation

against Canty. (Id. ¶ 65; Compl. Ex. P ["Mar. 31, 2018 Inmate Rule Violation"], ECF No.

1-9). Canty contends that the rule violation was written in retaliation for his filing numerous

ARPs and grievances. (Id. ¶ 65).

### 8.    Second Physical Altercation with Bryant

On April 1, 2018, Canty and Bryant got into an argument which led to a physical

altercation. (Id. ¶ 66). Later that day, Canty told Adkins about the fight, but Adkins said it

would be "covered up" since Canty was not dead and did not look too badly beaten. (<u>Id.</u> ¶ 67). Canty requested to go to medical because his mouth was bleeding, but Adkins instructed him to file a sick call slip instead. (<u>Id.</u>). Canty asked if he could refuse housing and Adkins told Canty, "you need to be a man and work it out with Bryant." (<u>Id.</u>).

### 9.     Cell Search and Alleged Threat Against Officer Payne

On April 24, 2018, Canty was housed in HU 2, D tier on cell restriction because of the March 31, 2018 Inmate Rule Violation. (Suppl. Compl. ¶ 15, ECF No. 7). At approximately 8:20 a.m., Canty attempted to give McKenzie an ARP regarding Defendants' conduct, namely Whiteman's alleged failure to respond to previous complaints about his restrictive housing conditions. (<u>Id.</u> ¶ 15). However, McKenzie refused to submit the ARP and complained about the ARPs Canty had written. (<u>Id.</u>).

About thirty minutes later, McKenzie, Officer Jeremy Payne, and Officer Justin Yutzy came to Canty's cell and told him to "cuff up." (<u>Id.</u> ¶ 16). They began searching his cell, and Payne and McKenzie began "mishandling and destroying" his personal property. (<u>Id.</u> ¶ 17). When Canty complained about Payne and McKenzie's conduct, Payne allegedly told Canty to "shut up" and said it was "[their] turn" because Canty "keep[s] writing grievances on [his] buddies Adkins and McKenzie." (<u>Id.</u> ¶ 18). Yutzy then escorted Canty to a holding cell because other inmates were returning from the yard. (<u>Id.</u> ¶ 19).

When Yutzy returned to the holding cell, he informed Canty that he was being accused of threatening Payne. (<u>Id.</u> ¶ 21). While he was waiting to be escorted to disciplinary segregation, Canty saw Whiteman and asked why the other officers were doing

10

all of this. (Id. ¶ 22). Whiteman allegedly responded, "I told you if you keep writing grievances on us you [will] pay for it." (Id.).

After Canty was moved to disciplinary segregation, Officer Michael Vanmeter came to Canty's cell with the inmate rule violation but refused to give him the third page, thereby preventing Canty from identifying witnesses and evidence, including the camera footage. (Id. ¶ 25). Vanmeter told Canty that he already reported that Canty refused to sign the notice so he could not "beat the ticket." (Id.). Canty asserts that the report, which accused him of using threatening language, was completely falsified. (Id. ¶ 26).

At the May 10, 2018 disciplinary hearing, which Canty characterizes as "unfair," Canty was found guilty and received 200 days in disciplinary segregation. (Id. ¶ 27).

**B.    Defendants' Response**

**1.    Transfer to Administrative Segregation & Powell Investigation**

On November 29, 2017, Canty was assigned to administrative segregation pending investigation of his claim regarding a recent altercation with Powell and the need to place Powell back on Canty's enemy list. (Nines Decl. ¶ 5, ECF No. 23-4; Johnson Decl. ¶ 4, ECF No. 23-5; Thomas Decl. ¶ 4, ECF No. 23-6). Johnson and Thomas were on the Case Management Team for Canty's December 5, 2017 administrative segregation hearing. (Johnson Decl. ¶ 6; Thomas Decl. ¶ 5). Nines approved Canty's reassignment to administrative segregation on December 12, 2017, based on the team's December 5, 2017 recommendation. (Nines Decl. ¶ 5).

The team, which did not include Johnson but did include Thomas, conducted another segregation review on December 27, 2017. (Nines Decl. ¶ 6; Johnson Decl. ¶ 14;

Thomas Decl. ¶ 5).[7] The team investigated Canty's claims regarding Powell and determined that Canty and Powell fought on April 27, 2014, but shortly thereafter, both signed enemy retraction forms. (Thomas Decl. ¶ 5; Forney Decl. ¶ 6, ECF No. 23-9). Additionally, there was no documentation supporting Canty's claim of an altercation with Powell "prior to Mr. Powell's return to general population." (Thomas Decl. ¶ 5). Therefore, the team determined that Canty should be removed from administrative segregation, and that there was no documented reason to place Powell on Canty's enemy list. (Id.). In Nines' absence, Roderick approved Canty's removal from administrative segregation. (Nines Decl. ¶ 6).

On January 3, 2018, Johnson told Canty that he would be moving to general population in HU 2 within one or two days. (Johnson Decl. ¶ 15). That same day, Canty was removed from administrative segregation and moved from HU1-A-056-A to HU2-D-044-A, for housing in general population. (Thomas Decl. ¶ 6; Mem. Supp. Defs.' Mot. Dismiss Alt. Mot. Summ. J. ["Defs.' Mot."] Ex. 3A ["Canty Traffic History"] at 1, ECF No. 23-7).

Powell and Canty were housed in HU 2, D tier from January 3, 2018 until April 24, 2018. (Forney Decl. ¶ 6). During that time, Canty and Powell did not have any altercations requiring changes to their enemy lists. (Id.).[8]

---

[7] In what appears to be a typographical error, Johnson's declaration states the review was held on December 27, 2018 rather than December 27, 2017.

[8] Canty concedes that he and Powell "never encountered each other on any pass, recreation or on the tier so that explain[s] why both inmates never had an altercation in that time period." (Pl.'s Opp'n Mem. ["Opp'n"] at 9, ECF No. 26).

## 2.    December 2017 Security Review Meetings

Johnson was on the team that conducted Canty's annual security review on December 12, 2017. (Johnson Decl. ¶ 7). During that security review, Canty's enemy list was discussed, insofar as it related to his then-current assignment status and how it contributed to his Total Institutional Score and security level recommendation. (Id.). As part of the review, the team inspected Canty's base file and the Offender Case Management System ("OCMS") to ensure any enemy conflicts were addressed. (Id. ¶ 8). The review revealed that Canty was involved in a fight with inmate Justin Davis on July 19, 2012. (Id. ¶ 9). Davis and Canty each signed enemy retraction forms in September 2012. (Id.). Canty was involved in a fight with Powell on April 27, 2014, in which Canty was described as the aggressor. (Id. ¶ 10). Canty and Powell each signed a retraction form within days of the incident, with Canty noting that Powell was "[n]ot [his] enemy." (Id.; Defs.' Mot. Ex. 4 ["Enemy Alert & Retractions"] at 1, ECF No. 23-8). Canty was involved in a fight with inmate Dwayne Doucett on April 15, 2015. (Johnson Decl. ¶ 11). Both inmates signed enemy retraction forms in May 2015. (Id.). On March 20, 2016, Canty was involved in a fight with Sidbury. (Id. ¶ 12). On August 24, 2016, Canty declined to remove Sidbury from his enemy list. (Id.; see also Enemy Alert & Retractions at 1).[9]

---

[9] As of December 16, 2017, Canty was housed in HU1-A-057-B and Sidbury was housed in HU2-D-038-A. (Johnson Decl. ¶ 13). Johnson's declaration states that this was Canty's and Sidbury's location as of December 16, 2016; that appears to be a typographical error, as the events at issue occurred in 2017.

On December 21, 2017, Nines received Canty's annual security review instrument for final approval. (Nines Decl. ¶ 4). Canty's total score was nineteen and the instrument recommended that Canty's security level remain the same. (Id.). However, Canty's case manager used a discretionary override to recommend a decrease in Canty's security level, which was approved. (Id.). Nines disapproved the recommendation because of the amount of time Canty spent in special confinement housing during the review period. (Id.). Nines made the final decision that Canty remain assigned to Maximum II until Canty demonstrated, for six months, that he was able to maintain behavioral improvement while housed in general population. (Id.).

### 3.    Altercations with Bryant

According to Forney, McKenzie, Baer, and Adkins, although Canty frequently asked to be moved to a single cell, Canty never said that he and Bryant were not getting along. (Forney Decl. ¶ 8; McKenzie Decl. ¶ 10; Baer Decl. ¶ 4, ECF No. 23-11; Adkins Decl. ¶¶ 5, 12, ECF No. 23-10). Whiteman asserts that although Canty informed him that he was not getting along with Bryant, there was no indication that Canty's assertion was true and Canty could not prove any reason for a cell move other than his desire to be in a single cell. (Whiteman Decl. ¶¶ 6–7, 13, ECF No. 23-12).

Adkins and Whiteman both assert that they never observed injuries on Canty suggesting that he and Bryant ever fought, and that Canty never requested medical attention as a result of being in a fight. (Adkins Decl. ¶ 6; Whiteman Decl. ¶ 8).[10] Moreover,

---

[10] Canty states that when he turned in a sick call slip to go to the medical department, "one of the prison officials submitted it into the wrong institutional mailbox so it was

Whiteman contends that Canty never provided Whiteman with affidavits or declarations from other inmates regarding his claims, and that no other inmates, including Bryant, ever contacted him to complain about Canty. (Whiteman Decl. ¶ 12).

###    4.    Recreation Time with STG Members

On February 18, 2018, NCBI received ARP No. NBCI-0237-18, after it was apparently redirected from headquarters. (Defs.' Mot. Ex. 18 ["Feb. 3, 2018 ARP"], ECF No. 23-22). Canty alleged that he submitted the ARP, which was dated February 3, 2018, to McKenzie on January 26, 2018, but the ARP was never signed or returned. (Id. at 1). In the ARP, Canty complained that STG inmates and non-STG inmates were supposed to be segregated, but on January 26, 2018, Canty was forced to take recreation with STG inmates. (Id. at 2).

Despite Canty's allegation that the ARP was never returned, the ARP was dismissed on February 13, 2018, with a notation that inmates may not seek reconsideration of case management decisions through the ARP process. (Id. at 1). Canty appealed and on February 27, 2018, the NBCI ARP coordinator was directed to review the rationale for dismissal and revisit the ARP for an amended response. (Id. at 9).[11]

---

redirected back to [him]." (Opp'n at 9–10). Canty attached a sick call slip dated March 12, 2018, which states "my lip is bust open from a fight" and which is marked as having been received by medical staff on May 5, 2018, via the mail. (Opp'n Exs. at 22, ECF No. 26-3). Canty was directed to resubmit the slip through the sick call process. (Id.).

[11] It is unclear from the record how this ARP was ultimately resolved.

### 5.      March 31, 2018 Inmate Rule Violation

Contrary to Canty's assertion, Adkins did not write an infraction against him on March 31, 2018. (Adkins Decl. ¶ 7).[12] Rather, McKenzie wrote the infraction charging Canty with interfering with or resisting the performance of staff duties, being in a location without authorization, and disobeying a specifically cited facility rule. (McKenzie Decl. ¶ 6; see also Defs.' Mot. Ex. 10 ["Mar. 31, 2018 Inmate Rule Violation"], ECF No. 23-14). On April 8, 2018, Canty was moved from cell HU2-D-044-A to HU2-D-046-A. (Whiteman Decl. ¶ 9). On April 10, 2018, Canty was found guilty of the rule infractions and sanctioned to thirty days of cell restriction from April 10 to May 9, 2018. (McKenzie Decl. ¶ 7; Mar. 31, 2018 Inmate Rule Violation at 6–7).

### 6.      April 24, 2018 Cell Search and Inmate Rule Violation

Adkins avers that he was reassigned to the HU 2 Control Center on April 24, 2018, following the receipt of an anonymous letter dated April 23, 2018, containing threats against him. (Adkins Decl. ¶ 8). Adkins was required to remain in this post until he discussed the threats with the Chief of Security. (Id.).[13]

On April 24, 2018, Officers Payne, McKenzie, and Yutzy conducted a random search of Canty's cell. (Payne Decl. ¶ 4, ECF No. 23-16; McKenzie Decl. ¶ 8; Yutzy Decl. ¶ 4, ECF No. 23-17). Payne had not met Canty prior to that day. (Payne Decl. ¶ 7).

---

[12] Canty concedes that Adkins did not write the infraction but claims that he was the officer that approached McKenzie about the incident. (Opp'n at 10).

[13] Canty argues that because the anonymous letter cannot be attributed to him, the cell search and other conduct of officers was clearly in retaliation for his filing ARPs, grievances, and lawsuits against them. (Opp'n at 10).

During the search, Canty allegedly threatened Payne and Adkins, necessitating Canty's removal from the area and issuance of a Notice of Inmate Rule Violation charging Canty with engaging in a disruptive act; use of intimidating, coercive, or threatening language; interfering with or resisting the performance of staff duties, including a search; and demonstrating disrespect or using vulgar language. (Adkins Decl. ¶ 9; Payne Decl. ¶ 5; Defs.' Mot. Ex. 15 ["Apr. 24, 2018 Rule Violation Docs."], ECF No. 23-19). Whiteman was the shift supervisor who reviewed the Notice of Inmate Rule Violation. (Whiteman Decl. ¶ 10). Whiteman and Bohrer then met with Payne and Adkins to advise them of Canty's threats against them. (Whiteman Decl. ¶ 11; Bohrer Decl. ¶ 4, ECF No. 23-15). Baer was not involved in the cell search but wrote an information report regarding his observation of the event. (Baer Decl. ¶ 6). McKenzie and Yutzy also wrote reports concerning the search. (McKenzie Decl. ¶ 8; Yutzy Decl. ¶ 4).

As a result of the incident, Canty was moved from HU 2 to HU 1. (Yutzy Decl. ¶ 7). Yutzy completed an inventory of Canty's property before his transfer. (Id.). Canty signed the Personal Property Inventory sheet and did not indicate that any of his property was missing, destroyed, or damaged. (Id.). Adkins, McKenzie, Payne, and Yutzy each deny mishandling or destroying Canty's property, or observing any other officer mishandle or destroy Canty's property. (Adkins Decl. ¶ 11; McKenzie Decl. ¶ 9; Payne Decl. ¶ 6; Yutzy Decl. ¶ 6). Officer Vanmeter served the Notice of Inmate Rule Violation on Canty that

same day. (Vanmeter Decl. ¶ 4, ECF No. 23-18). Canty repeatedly refused to sign the notice, which Officer Cox witnessed. (Id.).[14]

### 7.    Disciplinary Hearing

A hearing on Canty's alleged Inmate Rule Violation was held on May 10, 2018, before Hearing Officer Sipes. (Payne Decl. ¶ 8). Canty's requested witness, inmate Arthur Rogers, known as Jabril Shaheed, declined to appear. (White Decl. ¶ 5, ECF No. 23-20). Sipes reviewed the tier video but determined it was inconclusive. (Id.). Sipes found the officers' reports to be credible and reliable and Payne's testimony clear and concise. (Apr. 24, 2018 Rule Violation Docs. at 7). Sipes found Canty guilty of use of intimidating, coercive, or threatening language; interfering with or resisting the performance of staff duties, including a search; and demonstrating disrespect or using vulgar language. (Id.). Canty received a disciplinary segregation sanction for 200 days, which ended on November 9, 2018. (Id.).[15] Whiteman had no contact with Canty after he was moved to HU 1 as a result of this incident. (Whiteman Decl. ¶ 15).

---

[14] Canty provided an affidavit from inmate Donald Phipps dated April 24, 2018, which states that on April 24, 2018, between 11:23 a.m. and 12:30 p.m., Phipps heard Vanmeter approach Canty's cell and Canty ask for page three of his Rule Violation Notice so that he could request witnesses and evidence. (Opp'n Exs. at 21). Phipps heard Vanmeter reply, "I already wrote you refused to sign before serving you so you can't beat the ticket[.] I know they set you up[.] [S]top writing my coworkers up." (Id.). Canty filed ARP NBCI-064678 regarding Vanmeter's alleged refusal to give him page three of the notice. (Id. at 29–30).

[15] Canty unsuccessfully appealed the decision. (Opp'n Exs. at 31–34).

### 8.    ACA Cell Standards & Cell Assignments

Nines avers that the cells at NBCI meet the ACA standards for size, which require that each occupant have a minimum of twenty-five square feet of unencumbered space. (Nines Decl. ¶ 7). The cells at NBCI have a total of 52.9 square feet of unencumbered space. (Id.; Nines Decl. Attach. 2 ["NBCI Inmate Housing Cell Schematic"], ECF No. 23-4).[16] Nines also explains that NBCI meets the ACA standard regarding the provision of single occupancy cells, which provides that single cells should be made available for inmates who have severe medical disabilities; suffer from serious mental illness; are classified as sexual predators; are likely to be exploited or victimized; or have other special needs for single housing. (Id. ¶ 8; Nines Decl. Attach. 1 ["ACI Rules"], ECF No. 23-4). Nines avers that Canty does not meet any of these criteria. (Id. ¶ 8). Additionally, the ACA standards allow for the housing of all security levels in multiple cells unless there is a need for a single cell as articulated. (See ACI Rules).

Johnson explains that inmates who are documented as enemies can be housed in the same unit and tier if they are assigned to administrative or disciplinary segregation, as such inmates are always handcuffed and escorted when they are out of their cells. (Johnson Decl. ¶ 13). Cell assignments are made as needed, while ensuring that documented enemies are not assigned to the same cell. (Thomas Decl. ¶ 14). There is no policy that prohibits validated STG members from being housed with non-validated inmates. (Id.). Inmates who

---

[16] Canty argues that the cell schematic is for medical cells at NBCI and that the regular cells contain fewer square feet. (Opp'n at 4).

are documented enemies may be transferred or housed in separate housing units. (Id.). According to Johnson, Canty's enemy affiliations have been handled in accordance with Case Management Manual DOC.100.0002, § 19 Enemy Alerts. (Johnson Decl. ¶ 19).

At NBCI, HU 2, D tier houses Maximum II inmates. (Whiteman Decl. ¶ 14). In order to manage the population and minimize conflict, the tier is separated into sections, which permits similarly affiliated STG members to be housed in the same area. (Id.).[17] Inmates not affiliated with an STG may be and are housed with inmates who are affiliated with a STG based on housing needs. (Id.). Some cells remain empty in order to accommodate new inmates who require housing with a particular STG. (Id.).

## C.   **Procedural History**

On May 9, 2018, Canty filed a Complaint against Defendants. (ECF No. 1). Canty filed a Supplemental Complaint on August 16, 2018. (ECF No. 7).

At bottom, Canty alleges that Adkins, McKenzie, Baer, Whiteman, Forney, Thomas, and Johnson each knew that he faced a substantial risk of serious harm and failed to take reasonable measures to address it. (Compl. ¶¶ 70–73, 77–79; Suppl. Compl. ¶¶ 15–20). He alleges that Nines failed to correct Baer, Whiteman, McKenzie, and Adkins' misconduct, (Compl. ¶ 74), and that Bohrer failed to correct McKenzie and Adkins' misconduct, (id. ¶ 75). Canty further alleges that Baer retaliated against him by threatening him with disciplinary segregation for filing grievances. (Id. ¶ 76). Finally, Canty asserts that Defendant Dayena M. Corcoran, former Commissioner of Correction, witnessed

---

[17] Canty contends that Maximum II inmates have special needs for single cell housing. (Opp'n at 4–5).

misconduct by each Defendant but failed to correct it. (Id. ¶ 80). Collectively, the Court construes the Complaint as alleging: violations of the Eighth Amendment's guarantees of humane housing conditions and protection from violence; unlawful retaliation in violation of Canty's First Amendment right to petition for the redress of grievances; civil conspiracy in advancement of those constitutional violations; and violations of Canty's constitutional rights to substantive and procedural due process.

Canty seeks injunctive relief mandating a cell and tier reassignment, changing his recreation schedule, prohibiting Defendants from retaliating against him or threatening to have him placed on disciplinary segregation, and transferring him out of the Cumberland region. (Id. ¶ 83; Suppl. Compl. ¶ 40). He also seeks compensatory and punitive damages. (Compl. ¶¶ 84–85; Suppl. Compl. ¶ 40).

On March 11, 2019, Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. (ECF No. 23). Canty filed an Opposition on April 17, 2019. (ECF No. 26).[18] On March 31, 2020, the Court denied the Motion, finding that it was

---

[18] In his Opposition, Canty contends that as a Maximum II inmate he cannot be housed with an inmate with a lower security classification and that Maximum II inmates have special needs that require they be single-celled. (Opp'n at 4–5). Canty also claims that his security classification review was improper because he did not receive all of the points to which he was entitled because he was housed on administrative segregation and Johnson improperly referenced his enemy situation. (Id. at 5–6). He also maintains that the rule infraction received on May 25, 2018 was falsified. (Id. at 7).

Briefs in opposition to a dispositive motion may not be used to amend a complaint or add new claims. See Zachair Ltd. v. Driggs, 965 F.Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), aff'd, 141 F.3d 1162 (4th Cir. 1998); Mylan Laboratories, Inc. v. Akzo, N. V., 770 F.Supp. 1053, 1068 (D.Md. 1991), aff'd, 2 F.3d 56 (4th Cir. 1993). As such, the Court will not consider these new allegations raised in Canty's Opposition.

not ripe for resolution because Defendants Payne, Yutzy, and Vanmeter had not been served with the Complaint. (ECF No. 41). On August 19, 2020, Payne, Yutzy, and Vanmeter sought to join the previously filed dispositive Motion. (ECF No. 46). On September 8, 2020, the Court entered an Order denying Canty's Motions to Appoint Counsel, granting Defendants Payne, Yutzy, and Vanmeter's Motion to Join Defendants Motion to Dismiss, or in the Alternative Motion for Summary Judgment, and granting Canty until October 13, 2020, to file any additional response in opposition to the renewed Motion. (ECF No. 49). The matter is now ripe for review.

---

Canty also filed declarations on July 11, 2019, August 7, 2019, December 27, 2019, January 30, 2020, February 3, 2020, March 13, 2020, and October 2, 2020 attempting to supplement his claims and seeking injunctive relief. (See ECF Nos. 29, 31, 37, 38, 39, 40, 52).

Canty has filed a Motion to Add Defendant, wherein he seeks to add Officer Price as an additional Defendant. (ECF No. 51). He claims that on September 16, 2020, Price harassed him, was rude to him, and ultimately fired him from his prison job. The claims are unrelated to the initial Complaint. The Court will not consider these additional allegations, which involve different people, dates, and conduct occurring well after Canty filed his original Complaint. To the extent that Canty believes he has additional causes of action, he is free to file a new complaint.

Canty has also filed a Request for Production of Documents. (ECF No. 53). Canty requests a copy of a document sent to NBCI administration alleging that he planned to attack a staff member and which caused him to be removed from his job assignment on September 24, 2020. The request is denied. Discovery may not commence before defendants have answered or otherwise responded to the complaint, and then only after a scheduling order has been issued by this court. See Local Rule 104.4 (D.Md. 2018). No scheduling order has been entered in this case. Moreover, the discovery requested does not pertain to the allegations in the Complaint.

## II.    DISCUSSION

**A.    <u>Conversion</u>**

Defendants style their Motions as motions to dismiss under Rule 12(b)(6) or, in the alternative, for summary judgment under Rule 56. A motion styled in this manner implicates the Court's discretion under Rule 12(d). <u>See</u> <u>Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty.</u>, 788 F.Supp.2d 431, 436–37 (D.Md. 2011), <u>aff'd</u>, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" <u>Wells-Bey v. Kopp</u>, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, <u>Federal Practice & Procedure</u> § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. <u>See</u> <u>Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt.</u>, 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. <u>See</u> <u>Moret v. Harvey</u>, 381 F.Supp.2d 458, 464

(D.Md. 2005). The Court "does not have an obligation to notify parties of the obvious." Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 261 (4th Cir. 1998).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise satisfactorily the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d). A Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of discovery." Hamilton v. Mayor of Balt., 807 F.Supp.2d 331, 342 (D.Md. 2011) (citation omitted). A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (quoting Strag v. Bd. of Trs., Craven Cmty. Coll., 55 F.3d 943, 953 (4th Cir. 1995)).

The Fourth Circuit has warned that it "'place[s] great weight on the Rule 56[d] affidavit' and that 'a reference to Rule 56[d] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate

substitute for a Rule 56[d] affidavit.'" <u>Harrods</u>, 302 F.3d at 244 (quoting <u>Evans</u>, 80 F.3d at 961). Failing to file a Rule 56(d) affidavit "is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." <u>Id.</u> (quoting <u>Evans</u>, 80 F.3d at 961). Nevertheless, the Fourth Circuit has indicated that there are some limited instances in which summary judgment may be premature notwithstanding the non-movants' failure to file a Rule 56(d) affidavit. <u>See id.</u> A court may excuse the failure to file a Rule 56(d) affidavit when "fact-intensive issues, such as intent, are involved" and the nonmovant's objections to deciding summary judgment without discovery "serve[ ] as the functional equivalent of an affidavit." <u>Id.</u> at 245 (quoting <u>First Chi. Int'l v. United Exch. Co.</u>, 836 F.2d 1375, 1380–81 (D.C. Cir. 1988)).

Here, the Court concludes that both requirements for conversion are satisfied. Canty was on notice that the Court might resolve Defendants' Motions under Rule 56 because Defendants styled their Motion as a motion in the alternative for summary judgment and presented extra-pleading material for the Court's consideration. <u>See</u> <u>Moret</u>, 381 F.Supp.2d at 464. In addition, the Clerk informed Canty about the Motion and the need to file an opposition. (<u>See</u> Rule 12/56 Letter, ECF No. 24). Canty filed an Opposition, as well as numerous declarations in support of his claims, but did not include a request for more time to conduct further discovery. Because the Court will consider documents outside of Canty's Complaint in resolving Defendants' Motions, the Court will treat the Motion as one for summary judgment.

B.    <u>**Standard of Review**</u>

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. <u>Ricci v. DeStefano</u>, 557 U.S. 557, 586 (2009); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986) (citing <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." <u>Othentec Ltd. v. Phelan</u>, 526 F.3d 135, 141 (4th Cir. 2008) (quoting <u>Beale v. Hardy</u>, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. <u>Anderson</u>, 477 U.S. at 248; <u>see also</u> <u>JKC Holding Co. v. Wash. Sports Ventures, Inc.</u>, 264 F.3d 459,

465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

## C.    Analysis

### 1.    Respondeat Superior

Canty alleges that Nines failed to correct Baer's, Whiteman's, McKenzie's, and Adkins' misconduct, and that Bohrer also failed to correct McKenzie's and Adkins' misconduct. As to Corcoran, Canty asserts that she witnessed each Defendants' misconduct and failed to correct it. Thus, Canty's theory of liability as to Defendants Nines, Bohrer, and Corcoran is premised exclusively on the doctrine of respondeat superior.

It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. See Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004) (explaining that there is no respondeat superior liability under § 1983). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a

recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" Baynard v. Malone, 268 F.3d 228, 235 (4th Cir. 2001) (quoting Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984)). Thus, supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to, or tacit authorization of, the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. See Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994).

Such evidence is lacking in this case. First, Canty's claim against Corcoran is wholly conclusory and divorced from any factual allegations in his Complaint. Indeed, Corcoran's name appears only once in the Complaint—where Canty accuses Corcoran of failing to correct other Defendants' misconduct. (See Compl. ¶ 80). The Supplemental Complaint lacks any allegations regarding Corcoran. In all, Canty has failed to allege any facts that could give rise to an inference that Corcoran had actual or constructive knowledge of the misconduct alleged in this case.

Similarly, Canty's allegations against Nines and Bohrer are insufficient to support supervisory liability under § 1983. If anything, he alleges facts demonstrating that both Defendants properly advised their subordinates. For example, Canty alleges that on March 1, 2018, he wrote informal complaints to both Nines and Bohrer complaining about his cell

28

assignment and recreation with STG members. Canty alleges that Bohrer and Nines each instructed Whiteman to respond, and it was Whiteman who declined to change Canty's cell assignment and recreation schedule. Although Canty alleges that he sent Nines a follow-up letter on March 5, 2018, to which Nines never responded, such an allegation is insufficient to establish supervisory liability under § 1983. Thus, the Court will grant summary judgment in favor of Nines, Bohrer, and Corcoran, as there is no evidence that these Defendants were aware of, authorized, or displayed indifference concerning the misconduct alleged in this case.

### 2. Eighth Amendment Claims

### i. Failure to Protect

Canty's allegations are most fairly construed as an Eighth Amendment claim for failure to protect from violence. The Eighth Amendment protects inmates from physical harm committed by fellow inmates "resulting from the deliberate or callous indifference of prison officials to specific known risks of such harm." Pressly v. Hutto, 816 F.2d 977, 979 (4th Cir. 1987) (citing Davis v. Zahradnick, 600 F.2d 458, 460 (4th Cir. 1979)). As the United States Supreme Court has noted:

> Prison conditions may be restrictive and even harsh, but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective, any more than it squares with evolving standards of decency. Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society.

Farmer v. Brennan, 511 U.S. 825, 833–34 (1994) (internal quotation marks and citations omitted). For a prison official to be found liable under the Eighth Amendment for denying

an inmate humane conditions of confinement, "the official [must know] of and disregard[]

an excessive risk to inmate health or safety; the official must both be aware of facts from

which the inference could be drawn that a substantial risk of serious harm exists, and he

must also draw the inference." Id. at 837; see also Rich v. Bruce, 129 F.3d 336, 338 (4th

Cir. 1997). A two-part inquiry that includes both an objective and a subjective component

must be satisfied before liability is established. Farmer, 511 U.S. at 834, 837.

Objectively, the prisoner "must establish a serious deprivation of his rights in the

form of a 'serious or significant physical or emotional injury.'" Danser v. Stansberry, 772

F.3d 340, 346 (4th Cir. 2014) (quoting Farmer, 511 U.S. at 834). The objective inquiry

requires this Court to "assess whether society considers the risk that the prisoner complains

of to be so grave that it violates contemporary standards of decency to expose anyone

unwillingly to such a risk." Helling v. McKinney, 509 U.S. 25, 36 (1993). Subjectively, a

plaintiff must establish that the prison official involved had "a sufficiently culpable state

of mind" amounting to "'deliberate indifference' to inmate health or safety." Farmer, 511

U.S. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 302–03 (1991)). Evidence establishing

a culpable state of mind requires actual knowledge of an excessive risk to the prisoner's

safety or proof that prison officials were aware of facts from which an inference could be

drawn that a substantial risk of serious harm exists and that the inference was drawn. Id. at

837. Where prison officials responded reasonably to a risk, they may be found free of

liability. Id. at 844.

Canty contends that Defendants acted with deliberate indifference to his safety

because they forced him to live on the same tier with Powell, a former validated enemy; to

take recreation with validated STG members; and to share a cell with Bryant even after the two had a physical altercation.

Canty's claims fail to meet the objective component of Eighth Amendment liability. Canty describes a general fear of being housed on the same tier as Powell and having to take recreation with STG members. Canty's conflict with Powell was investigated, during which time Canty was moved to administrative segregation to ensure that he did not encounter Powell. Prison officials ultimately determined that although Canty and Powell had an altercation in 2014, each voluntarily consented to remove the other from his enemy list, and there was no basis for listing Powell as Canty's enemy. Moreover, despite being housed in the same facility, Canty admits that their paths did not cross.

Similarly, despite Canty's fears of having to take recreation with affiliated STG members while he is an unaffiliated inmate, there is no evidence that such an arrangement created any risk of harm to Canty beyond his own subjective fears of those inmates. Thus, Canty has failed to demonstrate a serious physical or emotional injury arising from his proximity to Powell and his recreation assignment, and neither put Canty at a substantial risk of injury. See Danser, 772 F. 3d at 346–47 (quoting Farmer, 511 U.S. at 834).[19]

_____

[19] While an inmate need not wait until he is actually assaulted, he still must show that he is, in fact, being exposed to an existing unreasonable hazard or condition. Helling, 509 U.S. at 35–36. Moreover, the hazard must be "sure or very likely to cause serious illness and needless suffering," and give rise to "sufficiently imminent dangers." Id. at 33, 34; see also Baze v. Rees, 553 U.S. 35, 50 (2008). Canty has not presented enough evidence to prove either condition. The general threat of inmate violence and one specific allegation of cellmate violence involving Bryant, at best, amount to "isolated incidents" that fail to demonstrate a sufficient risk of future harm. Shrader v. White, 761 F.2d 975, 978 (4th Cir. 1985) (quoting Withers v. Levine, 615 F.2d 158, 161 (4th Cir. 1980)). Thus, Canty is not entitled to relief based on a theory of risk of future harm.

Canty's claims regarding his placement with Bryant are equally insufficient. While Canty, Bryant, and other inmates attest that Canty and Bryant did not get along, there is no objective evidence that Canty and Bryant were in a physical altercation. No officers or inmates attest to Canty's injuries, and the sole medical record of the alleged altercation is a sick call slip, written by Canty, that was not received by the medical department for weeks. Assuming Canty submitted the sick call slip through the proper channels as he alleged, there is no indication that he filed an additional sick call slip when his first submission went unaddressed.

At bottom, Canty has failed to allege facts relevant to the essential elements of his failure to protect claim—serious physical or emotional injury or a substantial risk of injury—to create a genuine dispute regarding a material fact. See Celotex Corp., 477 U.S. 317 at 322–23 (1986). Accordingly, Defendants are entitled to summary judgment on this claim.

### ii. Cell Conditions

Canty next asserts that Defendants violated his Eighth Amendment rights because NBCI has a policy of placing two inmates in cells that are too small to adequately accommodate them, and by housing inmates with disparate security classification levels together, posing a higher risk of violence to each other. Canty argues NBCI's practices violate ACA guidelines.

Placing two or three inmates in a single cell, known as "double celling" or "triple celling," is not per se unconstitutional. See, e.g., Rhodes v. Chapman, 452 U.S. 337, 348 (1981). But overcrowding can constitute an Eighth Amendment violation where it is

accompanied by unsanitary or dangerous conditions that result in the deprivation of an identifiable human need. See Williams v. Griffin, 952 F.2d 820, 825 (4th Cir. 1991) (citing Wilson, 501 U.S. at 304). Moreover, while guidelines from institutions such as the ACA "may be instructive in certain cases, they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question." Bell v. Wolfish, 441 U.S. 520, 543 n.27 (1979); see also Rufo v. Inmates of Suffolk Cnty. Jail, 502 U.S. 367, 391 n.13 (1992). When considering claims that conditions of confinement constitute cruel and unusual punishment, "courts must bear in mind that their inquiries 'spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.'" Rhodes, 452 U.S. at 351 (quoting Bell, 441 U.S. at 539).

Here, Canty's challenges to NBCI's policies regarding double celling fail to meet the objective component of an Eighth Amendment claim. Despite NBCI's possible failure to meet the aspirational guidelines contained in the ACA standards, the conditions Canty describes do not demonstrate the deprivation of a human need sufficient to constitute a constitutional violation. See Robinson v. Weisenburger, No. 7:14CV00114, 2015 WL 5023745, at *6 (W.D.Va. Aug. 25, 2015) (holding sleeping on the floor, rarely being released from the cell block, and other "uncomfortable and inconvenient conditions" were insufficient for an Eighth Amendment overcrowding claim despite institution's failure to meet ACA standards). Moreover, this Court has previously rejected Eighth Amendment claims premised on this very argument. See, e.g., Tarpley v. Hogan, No. GLR-15-735, 2016 WL 4888914, at *5 (D.Md. Sept. 15, 2016) (dismissing Eighth Amendment claim

where prisoner argued that "NBCI has a policy of double celling inmates in cells too small to adequately accommodate them, while posing a high risk of violence to each other"). Thus, Defendants are entitled to judgment on this claim.

### 3.    Substantive Due Process

To the extent Canty complains that his designation as a Maximum II inmate or his assignment to administrative segregation, HU 2, or a particular cell violates his right to substantive due process, his claims must fail.

Prisoners do not have a constitutional right to access programs or to demand to be housed in one prison versus another, absent a showing of significant hardship. See Cole v. Pepper, No. GJH-18-3097, 2019 WL 4750295, at *7 (D.Md. Sept. 30, 2019). "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." Meachum v. Fano, 427 U.S. 215, 224 (1976). Limitations on a prisoner's liberty interests are not unconstitutional unless they impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). Thus, before deciding whether Canty is entitled to due process, it must be determined if the conditions under which he was confined constituted an atypical and significant hardship.

Assignment to administrative segregation does not create an atypical and significant hardship. See Hewitt v. Helms, 459 U.S. 460, 467 (1983) (holding that administrative segregation is part of the ordinary incidents of prison life). Additionally, inmates are not

entitled to be housed at any particular security classification or cell. See McKune v. Lil, 536 U.S. 24, 26 (2002) (stating that the "decision where to house inmates is at the core of prison administrators' expertise"); Veney v. Wyche, 293 F.3d 726, 734 (4th Cir. 2002) ("In formulating and executing decisions relating to cell assignments, we must allow prison authorities the discretion to take into account the particular safety and security concerns facing [the] inmates . . . ."); Slezack v. Evatt, 21 F.3d 590, 594 (4th Cir. 1994) ("[T]he security and custody classification of state prison inmates is a matter for state prison-official discretion whose exercise is not subject to federal procedural due process constraints.").

Here, Canty was moved to administrative segregation in order to investigate his claim that he had enemies in the institution. Specifically, Canty was either moved to, or required to remain in, administrative segregation based upon Sidbury's housing assignment or because of Canty's conflict with Powell. Canty cannot, on the one hand, complain that prison officials ignored his security concerns but then, on the other, accuse them of violating his constitutional rights because they assigned him to administrative segregation to address those very concerns.

Moreover, Canty received regular security classification reviews and his security classification was maintained or changed based on the classification review instrument and the determinations of the case management team and prison officials. Lastly, Canty's various cell assignments were made based on the needs of the facility at the time. Thus, Defendants are entitled to summary judgment regarding Canty's claims that his rights were

violated by his assignment to administrative segregation, security designation, or cell assignment.

### 4.  First Amendment Retaliation

Canty's retaliation claim is most fairly construed as a claim that he suffered retaliation for exercising his First Amendment right to petition for the redress of grievances. "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000). To state a claim of retaliation for exercising First Amendment rights, a plaintiff must show that: (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. See Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005).

While "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large," "incarceration does not divest prisoners of all constitutional protections." Shaw v. Murphy, 532 U.S. 223, 228–29 (2001). "[A] prison inmate retains those First Amendment rights that are not inconsistent with the status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). Specifically, the Fourth Circuit has held that an inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment. Booker v. S.C. Dep't of Corr., 855 F.3d 533, 545 (4th Cir. 2017).

A plaintiff can establish retaliatory conduct if the defendant took an action that "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." Martin v. Duffy, 858 F.3d 239, 249 (4th Cir. 2017) (internal quotation marks and citations omitted). A plaintiff must also demonstrate a causal connection between his First Amendment activity and the alleged retaliatory action. See Constantine, 411 F.3d at 501. The showing can be based on circumstantial evidence, such as evidence that the defendant was aware of the First Amendment activity and that the retaliatory act was temporally proximate to that activity. Id.

On March 31, 2018, McKenzie wrote a notice of inmate rule violation against Canty. Canty contends that the rule violation was written in retaliation for his filing numerous ARPs and grievances. The events precipitating this rule violation are alleged as follows: On March 6, 2018, Baer allegedly told Canty to stop writing grievances against staff, or Baer would put Canty on disciplinary segregation. A few days later, on March 13, 2018, Baer, Whiteman, McKenzie, and Adkins allegedly confronted Canty about his move requests and ARPs. Specifically, Whiteman allegedly told Canty that his ARP—though it is unclear which ARP—was going to be dismissed before telling Canty to go back to his cell. That day, Canty wrote a letter to the Commissioner, alleging, among other things, that Adkins told Canty that if he wrote "anything else" he would be placed in disciplinary segregation. (Mar. 13, 2018 Letter at 1). Soon thereafter, on March 31, 2018, McKenzie wrote an infraction charging Canty with interfering with staff duties, being in a location without authorization, and disobeying a facility rule. Canty was subsequently found guilty of those infractions and placed on cell restriction for thirty days.

Defendants Baer and McKenzie assert that they were unaware that Canty mentioned them in an ARP until they reviewed the accusations in this case. (See Baer Decl. ¶ 5; McKenzie Decl. ¶ 5). However, Baer and McKenzie do not specifically deny having knowledge that Canty had previously filed numerous grievances. Likewise, Whiteman and Adkins make no such averments. Given the temporal proximity between the relevant events, there is a colorable inference that Baer, McKenzie, Whiteman, and Adkins took adverse action against Canty—i.e., threatening him with disciplinary segregation and then charging him with violations that ultimately resulted in him serving thirty days on cell restriction—in retaliation for Canty's past grievances and the filing of his March 13, 2018 ARP to the Commissioner. Accordingly, Defendants are not entitled to summary judgment as to this claim.

Canty also asserts that on April 24, 2018, McKenzie retaliated against him for filing grievances and this Complaint when he "started mishandling and destroying [his] personal property[,] throwing everything around," while searching his cell. (Suppl. Compl. ¶ 17). The property included books, photos, clothes, legal materials, appliances and hygiene products. First, Canty's Complaint was filed on May 9, 2018, so it cannot be said that the April 24, 2018 incident was retaliation for filing the Complaint. Second, even if the officers mishandled or destroyed Canty's belongings, Canty has failed to demonstrate how that conduct "would likely deter a person of ordinary firmness" from exercising his rights under the First Amendment. Martin, 858 F.3d at 249. This is particularly true here, where Canty states that the officers threw books, clothes, pictures, and toiletries around and then generally concludes that the items were destroyed, without identifying with specificity

what items were destroyed or otherwise harmed. Accordingly, McKenzie is entitled to summary judgment on this claim.

Lastly, Canty asserts that Whiteman retaliated against him by falsely alleging that Canty threatened Adkins and Payne during the cell search, which occurred about thirty minutes after Canty spoke to McKenzie about his desire to file another grievance. However, Canty has not alleged that Whiteman was present during, or aware of, Canty's conversation with McKenzie. Without establishing that the individual responsible for the adverse action knew of his intention to file a grievance, the Court cannot conclude that Canty has established a genuine dispute of material fact regarding causation. Thus, a retaliation claim premised on this accusation fails, as Canty has not alleged an essential element of his claim, and Adkins is entitled to summary judgment.

In sum, Defendant McKenzie is not entitled to summary judgment regarding Canty's claim that he retaliated against Canty for filing grievances by charging Canty with rule violations on March 31, 2018. However, McKenzie and Adkins are entitled to summary judgment regarding the retaliation claims to the extent they are premised on allegations that McKenzie mishandled or destroyed Canty's personal property or that Adkins falsely accused Canty of threating Adkins and Payne.

### 5. Conspiracy

To establish a civil conspiracy under § 1983, Canty must present evidence that Defendants acted jointly in concert and that some overt act was done in furtherance of the conspiracy, which resulted in deprivation of a constitutional right. See Hinkle v. City of Clarksburg, 81 F.3d 416, 421 (4th Cir. 1996). An essential element for a claim of

conspiracy to deprive plaintiff of a constitutional right is an agreement to do so among the alleged co-conspirators. See Ballinger v. N.C. Agric. Extension Serv., 815 F.2d 1001, 1006–07 (4th Cir. 1987). Without an agreement, the independent acts of two or more wrongdoers do not amount to a conspiracy. See Murdaugh Volkswagen v. First Nat'l Bank, 639 F.2d 1073, 1075–76 (4th Cir. 1981). Thus, a plaintiff must allege facts establishing that defendants shared a "unity of purpose or a common design" to injure him. Am. Tobacco Co. v. United States, 328 U.S. 781, 809–10 (1946). "Independent acts of two wrongdoers do not make a conspiracy." Murdaugh, 639 F.2d at 1076.

"A conspiracy may . . . be 'inferred from the things actually done.'" Murdaugh, 639 F.2d at 1075 (quoting Overseas Motors, Inc. v. Imported Motors Ltd., Inc., 375 F.Supp. 499, 532 (E.D.Mich. 1974)). However, circumstantial evidence consisting of "coincidence piled on coincidence" are insufficient where the "proof of collusion is simply too attenuated" to conclude there was a conspiracy to violate the law. Murdaugh, 639 F.2d at 1075.

Here, Canty alleges that, pursuant to Adkins' instructions, Baer threatened to put Canty on disciplinary segregation if he filed any more grievances. Canty states that on other occasions, Adkins and Baer jointly threatened to drag Canty back to his cell if he failed to listen to them, and that Baer, McKenzie, Whiteman, and Adkins called Canty out of his cell to make similar threats. After Canty failed to comply, McKenzie ultimately filed an inmate grievance against Canty. For their part, Baer, McKenzie, Whiteman, and Adkins do not deny taking part in these interactions. As such, Defendants have not presented sufficient evidence to prove as a matter of law that they were not acting in concert to suppress Canty's

40

First Amendment rights. Accordingly, Defendants Baer, McKenzie, Whiteman, and Adkins are not entitled to summary judgment on this claim.

### 6.    Procedural Due Process

To the extent Canty asserts that his May 10, 2018 hearing before Sipes violated his procedural due process rights, this claim fails.

Prisoners retain rights under the Due Process Clause, but prison disciplinary proceedings are not part of a criminal prosecution and the full array of rights afforded to a defendant in disciplinary proceedings does not apply. See Wolff v. McDonnell, 418 U.S. 539, 556 (1974) (citing Morrissey v. Brewer, 408 U.S. 471, 488 (1972)). In prison disciplinary proceedings where an inmate faces the possible loss of diminution credits, he is entitled to certain due process protections. These include: (1) advance written notice of the charges against him; (2) a written statement of the evidence relied on and the reasons for taking any disciplinary action; (3) a hearing where he is afforded the right to call witnesses and present evidence when doing so is not inconsistent with institutional safety and correctional concerns, and a written decision; (4) the opportunity to have non-attorney representation when the inmate is illiterate or the disciplinary hearing involves complex issues; and (5) an impartial decision-maker. See Wolff, 418 U.S. at 564–66, 592; see also Dilworth v. Adams, 841 F. 3d 246, 253 (4th Cir. 2016).

There is no constitutional right to confront and cross-examine witnesses or to retain and be appointed counsel. See Baxter v. Palmigiano, 425 U.S. 308, 322 (1976); Brown v. Braxton, 373 F.3d 501, 504–505 (4th Cir. 2004). As long as the hearing officer's decision contains a written statement of the evidence relied upon, due process is satisfied. See

Baxter, 425 U.S. at 322 n.5. Moreover, substantive due process is satisfied if the disciplinary hearing decision is based upon "some evidence." Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455 (1985); see also Tyler v. Hooks, 945 F.3d 159, 171 (4th Cir. 2019) ("[T]he 'some evidence' standard is extremely broad in scope and presents a very low burden for prison officials to meet.").

Federal courts do not review the accuracy of a disciplinary hearing officer's findings of fact. See Kelly v. Cooper, 502 F.Supp. 1371, 1376 (E.D.Va. 1980). The findings will only be disturbed when unsupported by any evidence, or when wholly arbitrary and capricious. See Hill, 472 U.S. at 456; see also Tyler, 945 F.3d at 171–72; Baker v. Lyles, 904 F.2d 925, 933 (4th Cir. 1990). Thus, so long as there is some evidence in the record to support a disciplinary committee's factual findings, a federal court will not review their accuracy.

Here, Canty received all of the procedural rights he was due in his May 10, 2018 hearing before Sipes. Vanmeter gave Canty the Notice of Inmate Rule Violation on April 24, 2018. Canty contends that Vanmeter refused to give him page three of the notice in an effort to thwart Canty's ability to call witnesses and present evidence. Canty was, however, still permitted to call witnesses at the hearing; he only failed to present witnesses because the witness he called, Jabril Shaheed, refused to testify on his behalf. Further, Sipes allowed Canty to present video evidence. Sipes reviewed the video and found it inconclusive. Canty received Sipes' written decision, finding him guilty of the rule violations. That guilty decision was supported by reports, testimony, and video evidence, which more than satisfies the "some evidence" standard set forth in Hill. Moreover, Canty has not alleged

that Sipes was not an impartial factfinder. Accordingly, the Court will enter judgment in favor of Defendants as to Canty's procedural due process claim.

### 7.    Qualified Immunity

Having concluded that Baer, Whiteman, McKenzie, and Adkins are not entitled to summary judgment as to Canty's claims that they conspired to, and did, retaliate against him for filing grievances in violation of the First Amendment, the Court must now determine if Defendants are entitled to qualified immunity.

"[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Crouse v. Town of Moncks Corner, 848 F.3d 576, 583 (4th Cir. 2017) (alteration in original) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)). To overcome an official's qualified immunity defense, a plaintiff must establish "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

An "official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" Id. at 741 (alterations in original) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). When determining whether a right is clearly established, "a court does not need to find 'a case directly on point, but existing precedent must have placed the statutory or

constitutional question beyond debate.'" Crouse, 848 F.3d at 583 (quoting al-Kidd, 563 U.S. at 741). The Fourth Circuit has previously held that an inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment. Booker, 855 F.3d at 545. In so concluding, the Fourth Circuit recognized that the "unanimity among our sister circuits demonstrates that the constitutional question is 'beyond debate.'" Id.

Here, Canty has alleged that Defendants violated his First Amendment right by retaliating against him for filing grievances. Moreover, that right was "clearly established" at the time Defendants allegedly violated it in March 2018. Thus, Defendants Baer, Whiteman, McKenzie, and Adkins are not entitled to qualified immunity as to Canty's retaliation and conspiracy claims.

## III.   CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment (ECF No. 23). A separate Order follows.

Entered this 23rd day of November, 2020.

_____/s/_____
George L. Russell, III
United States District Judge